NOT DESIGNATED FOR PUBLICATION

No. 116,083

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.C.,
a Minor Child Under the Age of Eighteen.

MEMORANDUM OPINION

Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed February 3, 2017. Affirmed.

*Julie Grabbe*, of Herman Law Office, P.A., of Hays, for appellant natural father.

*Rita A. Sunderland*, assistant county attorney, and *Douglas A. Matthews*, county attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*:  T.M. appeals the district court's termination of his parental rights to his 6-year-old daughter, S.C. He contends his incarceration should have been considered a *mitigating* factor because of its impact on his ability to complete case plans. He also contends that the Department for Children and Families and its contractor, St. Francis Children's Services, failed to make reasonable efforts to reintegrate him with his daughter. Based upon our review of the record, we disagree. We affirm the district court's decision.

S.C. was born in 2009. At that time, Father was under supervision of community corrections for a severity level 2 drug felony. Father visited S.C. and her mother at the hospital once and visited S.C. twice when she was several weeks old. He took diapers,

1

wipes, and formula to those visits. After those early visits, Father was arrested in April 2009 for a probation violation and new charges; he did not see S.C. again because he was incarcerated and he was unaware of her location.

On June 17, 2014, S.C. came into State custody when a search warrant was executed on a residence in Great Bend. S.C.'s mother and her three younger children by another father were found in the home; police also found various illegal drugs at different locations in the house in areas near the children. Police then learned that Mother had an older child, S.C., who was at her maternal grandmother's home. Upon arrival at the grandmother's residence, the police determined the grandmother appeared to be under the influence of narcotics. Accordingly, S.C. also was taken into protective custody.

The State filed a child in need of care petition in June 2014. After S.C. was placed in the Department's custody, Father was given notice of the proceedings; he had been released from Lansing about that time. The court also appointed counsel to represent Father. The court decided S.C. was a child in need of care in July 2014. The court gave St. Francis discretion to schedule visitations between Father and S.C. It was after the petition was filed that Father had his first contact with S.C. since she was a newborn.

Father visited with S.C. several times over the next couple of months. St. Francis assigned him some case plan tasks to continue with his mental health treatment, maintain employment, avoid additional criminal charges, and find an appropriate home. Father continued mental health treatment, worked, and attended college at night. Initially, Father's visits were short because S.C. had not met him since birth. S.C. was shy but warmed up toward the end of the first visit. The length of the five visits increased each time and seemed to go well. By August, S.C. was greeting him as "dad" and hugging him. Several of the visits, however, were cancelled because Father was sick. The foster parent also reported that on several occasions, S.C. begged to not go to the visitations and had begun wetting the bed at night.

2

Shortly after, however, Father was back in custody and returned to prison after being convicted for distribution of synthetic marijuana and battery on two law enforcement officers. At the time of the termination trial, Father's early release date was September 27, 2020, which could be extended if he has any disciplinary incidents while in prison. He admitted he had received several disciplinary reports in 2016 and had numerous disciplinary reports during his prior incarceration.

After he was reincarcerated, the court permitted Father to write letters to S.C. that were required to go through St. Francis; the court gave the agency the discretion to terminate the letter-writing if they became inappropriate. Father sent at least six cards and letters to S.C. through St. Francis. However, the correspondence was withheld and kept in the social file because the social worker and also S.C.'s therapist thought they were inappropriate for a child S.C.'s age as they were too Father-focused. When Father learned S.C. was not receiving the letters, he filed a motion for a review hearing, asserting he had never been advised that his letters were not being delivered or were considered inappropriate. After being given guidelines by St. Francis about what was appropriate, Father did send additional letters and several cards to S.C. which were delivered to her. A St. Francis supervisor admitted the case worker should have immediately contacted Father and told him that his letters were inappropriate and how to correct the issue rather than simply placing the correspondence in S.C.'s file.

In November 2015, the State filed a motion to terminate S.C.'s parents' rights. The motion noted that Father had a history of both drug and nondrug related criminal charges and had been in and out of prison for the majority of S.C.'s life. The State further alleged that after Father sporadically visited with S.C. during the child in need of care case, S.C. began wetting the bed, and on more than one occasion, the child begged not to be taken to the visitation. S.C.'s bed-wetting stopped after Father's visits stopped. The State further alleged that while Father sent letters to S.C., social workers deemed them inappropriate and S.C.'s therapist recommended that Father's letters not be given to the child because

3

they would be confusing to her. The State alleged Father was paroled in March 2015 but absconded from parole, was arrested on additional charges, and sent back to prison. He had a number of disciplinary violations while in prison before his 2015 parole. After the motion to terminate was filed, Father sent a belligerent and profanity-filled letter to St. Francis staff. Father sent the letter when he was really upset and later testified that he regretted his actions.

Prior to the termination hearing, Mother relinquished her rights to S.C. Accordingly, the termination hearing was limited to Father's parental rights. During the termination hearing, Father testified he made efforts to comply with the case tasks while in prison. Father did meet social workers once while in the Saline County jail after his 2014 arrest. Father testified he received mental health services while in El Dorado Correctional Facility. He was seen by a therapist on a monthly basis and a doctor every 3 months; he had been diagnosed with borderline personality disorder, bipolar disorder, and depression. Father admitted to not providing any financial assistance to S.C. despite a court order because he had no financial assets while in prison but asserted that he attempted to maintain contact with S.C. He also tried to maintain contact with S.C. through the letters and cards discussed above. St. Francis had six in-person meetings with Father in 2015 while he was incarcerated.

Other than continuing mental health treatment, Father had not been able to complete many of the case plan tasks. He testified that the Department of Corrections wanted inmates to attend the classes when they were about 18 months from release. During his prior incarceration, however, Father testified that he had taken two parenting classes, substance abuse classes, and some housing classes. At the time of the hearing, he had applied to take a paralegal class and was planning to take parenting classes and substance abuse classes. At the time of the trial, however, Father's earliest possible release date was September 27, 2020. St. Francis attempts to work with incarcerated parents, but it has to receive permission from the prison facility to visit.

4

St. Francis workers testified at the termination hearing about Father's visitations with S.C. and the letters and cards he sent her through St. Francis. They also discussed their ongoing attempts to work with Father despite restrictions on visits with the prison system. The handling of Father's correspondence to S.C. was discussed in detail, and a St. Francis supervisor admitted the problem was initially not handled appropriately. Regardless of Father's attempts to maintain contact with S.C., the St. Francis supervisor opined that even if Father were released from prison immediately, it would likely take a year for Father to show he could comply with all the case plan requirements and reinitiate a healthy relationship with S.C.

S.C.'s therapist, a licensed specialist clinical social worker, also testified at the trial. The therapist began seeing S.C. in March 2015 and conducted 11 sessions with the child; S.C.'s therapy stopped in June 2015 and restarted in September 2015 when S.C. restarted visitations with Mother. The therapist found that S.C. suffered from an adjustment disorder with symptoms of child neglect; there was also some element of past physical and/or sexual abuse. The therapist had reviewed letters that Father had sent to S.C. through St. Francis; she recommended they not be given to S.C. at that time because they were more focused on Father and his regrets rather than being focused on S.C. The therapist thought the letters would confuse S.C., who already was parentified in her behaviors likely due to having to care for her younger siblings. The therapist could not opine that reintegration with Father was appropriate even if he was immediately released from prison because she had not met Father and S.C. never mentioned him during therapy sessions. The therapist understood that S.C. did not meet Father until she was in foster care.

The court ruled from the bench. The court found that Father's rights should be terminated based on K.S.A. 2015 Supp. 38-2269(b)(5) because of his felony conviction and imprisonment, the fact that he was in prison from immediately after S.C.'s birth until the time of the child in need of care proceeding, and was convicted again and will be in

5

prison until 2020. Under K.S.A. 2015 Supp. 38-2269(b)(8), the court recognized that Father's incarceration limited his ability to care for S.C. and to comply with reintegration tasks, although that was in large part due to the restrictions caused by his incarceration. However, the court recognized that S.C. had been in extended out-of-home placement as a result of Father's actions of committing new crimes, a factor relevant under K.S.A. 2015 Supp. 38-2269(b)(9). The court also cited K.S.A. 2015 Supp. 38-2269(c)(4), noting that Father failed to pay a reasonable portion of the costs of S.C.'s care except a few items immediately after S.C.'s birth. With respect to Father's letters to S.C. that were withheld by St. Francis, the court recognized that St. Francis should have handled the situation better, but under the circumstances, reasonable efforts were made to reintegrate the family as required by K.S.A. 2015 Supp. 38-2269(b)(7). Finally, the court relied on Father's lack of contact with S.C. shortly after her birth in 2009 until the initiation of the child in need of care proceeding in 2014. The court noted that when Father reinitiated contact with S.C. during the proceeding, he again violated the law and was returned to prison. The court held that it could not wait for 4 years for Father to be released and then see if the family could be reintegrated. The court noted Father had been incarcerated for 90 to 95 percent of S.C.'s life. The court found Father unfit and that his unfitness was unlikely to change in the foreseeable future.

On appeal, Father argues that the court erred in finding him unfit under K.S.A. 2015 Supp. 38-2269(b)(5) and (b)(8) because his incarceration should have been considered a mitigating factor. He asserts that the court has recognized that imprisonment did not require automatic termination and it can impact on a parent's ability to make efforts to adjust their circumstances to meet the needs of the child. He relies on *In re M.D.S.*, 16 Kan. App. 2d 505, 509-11, 825 P.2d 1155 (1992). See also *In re F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

Father also argues that the Department and St. Francis failed to make reasonable efforts to rehabilitate the family under K.S.A. 2015 Supp. 38-2269(b)(7). Father focuses

on St. Francis' withholding of his letters to S.C. from January to May 2015 without notifying him that they were withheld and not telling him how to address St. Francis' concerns immediately. Finally, Father questioned the therapist's testimony because she testified under the incorrect assumption that Father and S.C. had never met.

We review a district court's decision to terminate parental rights by considering "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," the parent's rights should be terminated. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, an appellate court does not reweigh conflicting evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. As the observer of the witnesses, the district court is in the best position to determine the best interests of a child, and an appellate court will not disturb the district court's judgment in the absence of an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Gant*, 288 Kan. 76, 81-82, 201 P.3d 673 (2009).

Under K.S.A. 2015 Supp. 38-2269(a), when a child is adjudicated a child in need of care, a district court may terminate the parent's rights if the moving party establishes by clear and convincing evidence "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." If the district court finds the parent unfit, the court must then determine whether termination of parental rights is in the child's best interests. K.S.A. 2015 Supp. 38-2269(g)(1). The child in need of care code clearly states that the existence of a single factor, standing alone, may establish grounds for termination of parental rights. K.S.A. 2015 Supp. 38-2269(f).

7

In this case, there was ample evidence to support the court's finding that Father was unfit and unlikely to change in the foreseeable future. Although Father's imprisonment may have made it difficult for Father to comply with reintegration plans, it may still be considered a factor supporting termination. *In re M.D.S.*, 16 Kan. App. 2d at 510-11. In this case, Father was incarcerated before S.C.'s birth, although he had been released and was able to visit S.C. several times after her birth. Notwithstanding S.C.'s imminent arrival and birth, Father incurred new charges and was again incarcerated until S.C. was nearly 6 years old. Although he testified that S.C.'s mother was uncooperative, Father did not testify about any meaningful efforts he or his family made to locate and connect with S.C. before the case was filed. In addition, despite his parole and his reconnection with S.C. through St. Francis' visitation efforts, within a few months Father was arrested, had his parole revoked, and pled guilty to new charges. Thus, his own actions terminated his ability to build and maintain a meaningful relationship with his daughter. These actions were the result of Father's own choices, which reflect no consideration for the care of his daughter. These facts also support the district court's finding that Father was unable to change his conduct and that he continued to be unable to care properly for S.C. See *In re B.L.S.*, No. 112,748, 2015 WL 2343420, at *4 (Kan. App. 2015).

Finally, the district court correctly acknowledged the child in need of care code requires that all proceedings be disposed of without unnecessary delay. K.S.A. 2015 Supp. 38-2201(b)(4) Our courts must strive to decide these cases in "child time" rather than "adult time." *In re J.A.H.*, 285 Kan. 375, 386, 172 P.3d 1 (2007). In this case, Father has been incarcerated for all but 4 to 6 months of S.C.'s life and was to be incarcerated for another 4 years after the termination hearing. Based upon the totality of the record, there is clear and convincing evidence that Father was unfit and unlikely to change in the foreseeable future.

In addition, despite Father's attempts to communicate with S.C. after the case was initiated, there is little or no evidence of a meaningful bond between Father and S.C. The child never mentioned him in therapy, and the social worker's file did not indicate that the child missed Father. The 2 weeks after her birth and the 4 months of contact when S.C. was 6 years old is simply insufficient to infer any significant bond had developed. Accordingly, the district court did not abuse its discretion in finding it was in S.C.'s best interests to terminate Father's parental rights.

Affirmed.